Case number 16-2365, Wal-Mart Real Estate Business Trust v. Eastwood LLC et al. Oral argument not to exceed 15 minutes per side. Mr. William Tomlin for the appellant. You may proceed. May it please the Court, William Tomlin on behalf of Eastwood LLC. I'm reserving three minutes for rebuttal, Your Honors. Thank you. I'd like to turn the Court's attention to what I think is the single most important document in this case and the two most important exhibits to it. That's at the record 23. We're talking about the First Amendment to lease and exhibits C and D to the First Amendments to the lease. Those are included with a blow-up version because they were a little small at 119-1. If any of the members of the Court would like copies of those, I have them for them. If not, I will proceed. Do you have page IDs for those? I do. Exhibit C is 23.4. Exhibit D is 23.5. Page IDs 409 and 410. The enlarged copy of Exhibit C is 119-1, page ID 1951. I'd like to see one of the enlarged copies, please. Yes, Your Honor. It's on my approach. Thank you, sir. As the Court can see by looking at these particular documents, the attachments to the lease, which were incorporated into the lease, set forth very plainly a requirement for two specific sizes and two specific sizes only. That was a 151,450 square foot pre-expansion construction and a 213,234 square foot. Why do you think Walmart would agree to be bound by such a specific figure when it didn't yet have any specific plans, as far as we know, for building? Well, Your Honor, it was part of the record below that there were some discussions between the developer and Walmart about Walmart expanding within a few months once it opened. The representations Walmart made to Eastwood, which again are set forth in the record, are that Walmart liked to open up smaller stores because it had worker issues and that by opening smaller stores it had less union issues and then it subsequently expanded them. What happened in this particular case, and when you look at the history of it, it's further explained by the fact that there was some litigation in the initial stage of the performance by the parties. So they signed the lease in January of 2002. Eastwood expedited preparation of the site. You're not answering really what I ask you. It's just that it seems to me that looking at your interpretation of the agreement, there would be absolutely no reason for a party like Walmart to agree to that. The reason was, Your Honor, because of the dispute between the parties early on, there was a previous litigation and this particular amendment was generated as a settlement to litigation. The parties had a certain level of mistrust one for the other. I still don't understand why Walmart might have agreed to something that wouldn't permit it to make any modification going forward in the size of the expansion. I'm not finding the reason there. They wanted to know for certain that they would be able to construct this. They wanted to pin Eastwood down, that we're going to be able to build this 151,400 feet. Why isn't it more reasonable to have the square footage figure as an upper ceiling? That might have been a better decision for Walmart to engage in, but it's not what Walmart did and it's not what the parties agreed to. One point that I would indicate, Your Honor. That's primarily in these three drawings? Yes. And there was supposed to be a third one, Exhibit B1, which was an actual site plan of the premises, but through some... Is there any language which says these three drawings are the only way it can be done? Yes. Drawing isn't a sentence. I mean, it's just a drawing, right? If you take a look at the drawings, Your Honor, you'll see that referenced in the drawings are specific references to plans and architectural drawings that were prepared that were more specific. It talks about the contractor referring to the architectural plans for exact locations and dimensions. And when you look as well at the Declaration of Easement Conditions and Restrictions, which was a multi-party document which governed the entire center, the ECR specifically required that the building locations, front walls, ingress and egress locations, and the parking fields could not be changed without the mutual agreement of all the parties to that particular... But what business interest, not interest in litigation, trying to avoid a contractual obligation, but apart from the litigation, what business interest of Eastwoods would have been served by saying you can only build this many square feet, not five more square feet, not five fewer square feet? What's serving your business interest there? And to be fair, Your Honor, I do want to say I think that what we're talking about here, it's not necessarily if they were five feet off in any direction that's a problem. But being 50,000 feet off in a direction is a problem. The reason that was a... I'm sorry. In the agreement, you've talked about things that would permit an expansion that Walmart wanted to come in with the small stores and then be able to expand later. Was there any language in the contract that required Walmart to expand to some specific size? There's language in the attachment which is incorporated into the contract. They must expand at some point in time. I don't think that it was required to expand. But if it did expand, which ties back into your question, Your Honor, why is that a problem to Eastwood? What Eastwood bargained for was essentially, we'll admit, a roll of the commercial dice. They believed that Eastwood at some point in time was going to have to expand this store. And these big box stores really are not particularly profitable. I know that sounds strange to say, but for developers, they're not particularly profitable. These are lost leaders. The big box stores have very low rent. They take up a lot of land. And what the landlord does is they bring these big box stores in because it increases traffic to the balance and increases the value of the balance of the shopping center. The landlord wants to know, or at least have a pretty good assurance, that these stores are going to be built in a manner that brings in the maximum amount of traffic. Walmart, on the other hand, having its business interests, doesn't want to be too pinned down. But what the landlord bargained for was, look, I think Walmart's going to have to expand. And I'm going to make the agreement that if they have to expand, they've got to expand to 213, 234 because I want as much traffic as I can. Well, if that's your motivation, then why would you have refused to cooperate in getting the permits and that sort of thing? Because the 186,000 square foot store is not what was bargained for. The flip side of that bargain is that if Walmart doesn't build to what the developer has agreed to, the 213, 234, is that Walmart has to come back in and negotiate with the developer in good faith. So if we only get a smaller expansion, we don't want an expansion at all? Or are you just trying to exert bargaining power to get Walmart to go back to its initial plan or to the maximum square footage? My client wanted Walmart to abide by its agreement of the 213, 234 because that was what my client thought was going to be the optimal size for the store and to benefit not just my client, but to benefit all of the other tenants in the shopping center. Since they didn't have to expand at all, it's hard to see why you weren't better off with a smaller expansion than none at all, which is what you ultimately got. Well, that's what the parties ultimately did today. But we have no way of knowing. This is a long-term lease. Walmart's got, I think, 13 five-year extensions. They're going to be here for 65 years after this lease is over if they want to be. My clients remain confident that Walmart at some point in time is going to have to expand the store. And I guess the flip side of that, Your Honor, isn't Walmart really trying to exert a little bit of bargaining pressure on my client to bargain down from the agreement it made of 213, 234? When you look at the timeline, which I provided. Where exactly is the agreement? Is it in these three pages with the drawings on them, or is it in some language which incorporates those pages? That's a great question, Your Honor. There's several agreements. There was a settlement agreement. What's the best one that supports you the most strongly? That would be. The closest thing to a smoking gun that says, if you're going to do it, you have to do it this big. That would be the First Amendment, Record 23. What's the page ID for that? The page ID for 23 is 393. And that particular page ID, Your Honor, references right back to the incorporation paragraph, which is 18B of the First Amendment, which specifically states that all exhibits attached here to and all exhibits attached to the original lease are made a part of the lease. But making them a part isn't the same thing as saying you have to do it. Let's see. Unless otherwise. Is this the language, 18B, that you're relying on? Yes, Your Honor. Unless otherwise provided for. If you take a look at. I'm not getting it from those words. If you take a look at the Chesterfield case, Your Honor, that we cited. I'm looking for language in the language that you're operating, that you're saying requires this. Is this the best you have, 18B here? Well, I think if you take a look, Your Honor, at page ID 1951, which is. That's the drawing too, right? Which is the drawing. Do you have any language which says you have to do what's in the drawing, you can't do anything else? That would be if you take a look back at the ECR, specifically says that if there's going to be. Where is that? 101-1. You have a page ID for that. I'm operating, obviously, off a page ID. Sure. If you take a look at page ID 1575 in the ECR, it indicates that the parking field ingress and egress points of any building shall not be altered without the written consent. So essentially. You have to sort of infer something from that, though, don't you? Well. Does that say you have to build to a certain size? Your Honor, I think you raise a great point. Yes, you have to infer something from that. And since inferences have to be drawn, the district court should not have granted some redisposition in this matter. You said 1575? 1575. And it's at paragraph 5H. That deals with obstruction of vehicular movement? If you're so concerned that you want them to build a big store, if you're going to build a big store at all, would you really hide it in your ingress and egress document? No, Your Honor. I'm looking for something that's. I understand what you've explained to Judge. I mean, I think what you've explained to Judge Gibbons is your motivation. You want to force them to buy. You really want them to have a big store there. And you know that they want to do a store, so you want to force them, if they're going to do a store, to do a big one. Correct. It seems like a lawyer could get that language in there a little bit more expressly than saying something about obstruction of vehicular movement. Well, Your Honor, if you take a look. Right? I mean, if this is something that you want in there, there ought to be something a little bit more direct. I'm sorry, Your Honor. Drawing doesn't say that either. Drawing is just a drawing. I mean, drawing doesn't have meaning just because it's a drawing. You could have something saying, if it doesn't conform to this, then you can't build it. Where is that? Paragraph 4B of 101-1, and that's page 1569, and that's at paragraph 4B. Mr. Tomlin, you're out of time, but Judge Rogers is going to finish this line of questioning. I'm just looking for it. Is just a few pages back? Yeah. It says, the location of buildings on the shopping center be substantially similar to those building footprints set forth on the master site plan. Okay. What page number is that? 1569, Your Honor. Okay. Thank you. Thank you. Okay. Your time is up. You'll have your rebuttal time. Thank you very much, Your Honors. May it please the Court, good morning. My name is John Mucha. I'm here on behalf of Walmart Real Estate Business Trust. The appellant in this case took a deep dive right into the question of whether or not there was an obligation here in any of these documents for Walmart to construct an expansion to a specific size and or to construct it according to any specific timetable or phase. There is nothing in these documents that requires that. What do you do with the thing that he finally came up with at the end? It says, the location of the buildings on the shopping center have to be substantially similar to the building footprints set forth in the master site plan. When this ECR was prepared before the lease was entered into, it's a document that sets forth the location of the buildings relative to each other. The footprints? Well, the location is defined by that footprint. There is no size on that ECR exhibit. The answer is that a footprint doesn't show size? Well, the footprint doesn't show a mandatory size or requires that we build it. Nothing was built in. Is this a binding document? It's binding. It's binding. Nothing was built in this case. There is no breach. Walmart did not build a structure contrary to the ECR. I'm not asking that. I'm asking if you built it, would you be required under the contractual documents to build it to the size that is contained in the site plan? That's their argument. I mean, you can argue against something that they're not arguing, but that's their argument. This ECR, as I said, this ECR predates the construction of the existing store. You said it's part of the contractual obligation. Yes, but the existing store was built to 151,000 square feet. There was never any challenge to that or any concern or claim that it was somehow in violation of the ECR or that the building was in the wrong location. So would you, I mean, would you, I won't ask you to concede, but given that the site plan refers to specific square footage, doesn't that, if it doesn't bind Walmart, does it create an ambiguity in the contract? Is it something that creates an uncertainty? Not at all. Why not? What you have to do here is you have to look to see what the purpose of these exhibits are, and there are multiple references within the lease document itself that references the purposes of the ECR. So you would have to look at the language in the agreement and the incorporated site plans and then go to some kind of purposivist interpretation to get there? It sounds like ambiguity. No, it's not, because there are specific purposes for these documents. If these documents were intended to create a duty contrary to the express statement of the parties that no duty would be created, then we would have had language that says that. The express language of this lease says we refer to the master site plan and to the ECR for a number of very specific purposes, and that would be listed out in paragraphs 13 and 14 of the lease. Those references never, in any context, in any way, shape, or form, ever say that there is a duty to expand or there's a duty to expand in a single iteration, in a single time, in a single phase. They agree there's no duty to expand. Because I understand the duty that they're arguing is in the documents, is if you expand, you have to expand big. It's kind of their excuse for their own conduct in the course of litigation, I think. That's the way I read it. This lease doesn't provide for any additional rent to them if the store remains 151,000 square feet or if it is double that. Well, we talked a little bit a moment ago about the motivation of the parties. I'm not talking about them. All right, I'm sorry. It's a good thing to talk about. It's not what I'm asking about. I'm asking about contractual obligations that will reflect whatever the motivation. Well, I think we have to look. A contractual obligation, if I understand it, and I need to understand it, is contractual obligation, if you build, you must build up to a certain size. It doesn't say that. I know you say that it doesn't say that, but it doesn't support the fact that it doesn't say that to say that they don't need to build. That's not what they're arguing. You say it doesn't say that because they don't need to build. They're not arguing that they need to build. They're arguing if we build, we have to build to a certain size. Are you with me? Another way to frame that question is the question of why are those numbers there? I guess that's really what you're asking. Why are those numbers there? If they're not to do what the appellants say here, why are they there at all? And what I say in response is that the lease guides you in that answer. The lease tells you why those numbers are there, and they're there to show the shopping center as a whole, the location of common areas. What you're saying is this goes to sort of general location rather than size. Yeah, in the formation and creation of a real estate deal such as this. Right, and there's nothing here in any of the references to either the master site plan or to the ECR that specifically states that you have to build this store, and if you go to build it, you must build it to this specific size, or if there is such a duty, that you have to build it all at once. That's so key to this case because 186,000 square foot expansion is never a breach, even if you accept the fact that there was a larger 213,000 square foot number or 223,000. They can't quite settle on a particular number. They've argued many different numbers that they believe were agreed to by the parties here, and Judge Maloney points that out quite properly in his opinion. But there's nothing here that says that building to 186,000. About the lack of a sanction, that's the other issue. Let me just finish this one thought. There's nothing in these documents anywhere that says that building to 186,000 square feet, even if there's some ultimate goal, and I'm not conceding that there is some ultimate goal or obligation to build to a larger expansion size. Walmart might. It would depend, but they have the ability to do that. That's the permissible building area that's defined in the lease, and if Walmart elects to build only a portion within that permissible building area that's defined in the lease now and then reserves for itself the ability to build up to this bargain for maximum that it wants of 213,000 square feet, it has the ability to do that. And there's nothing in this lease that prohibits it from doing it or imposes a duty on it to do it in any other manner. So that's what I'm going to say about that. Sanctions. Sanctions. Can you interfere with someone else's ability to provide a witness without threatening someone? We didn't threaten. I didn't ask what you did. I'm saying is it possible? Do you need to have a threat in order for it to be unethical? Why couldn't you just ñ I wonder whether it's ethical to call up somebody who's a friend of yours and say somebody that works for you saw a traffic accident that I was in. Can you get them not to testify? Is that ethical? I think that what we have here in this ñ You just don't want to answer my hypothetical. Well, I'm not quite sure what the hypothetical is. I mean, if they were to call up ñ You have a situation where one lawyer is trying to get the other lawyer from putting on a witness or trying to get that witness to refuse to testify. Is it okay to try to get them not to testify as long as you don't threaten them? Just try to pressure them a little bit or use friendship. Your Honor, honestly, I've never explored the backwaters of this particular issue because those aren't the facts of this particular case. It looks like they're trying to get them not to testify. Not at all. It's questionable whether they're threatening them with something. It's hard to read a threat into that letter. But I'm just wondering whether it's enough just to say there's no threat. Wouldn't it be problematic if it was pressure as opposed to threat? There was a ñ No, I don't think it would be just pressure as opposed to threat. The law is pretty ñ Pressure's not enough. I don't believe so. I don't believe that. And there's no case ñ No, I mean, I think it would just be easier for you in dealing in this question to say, yes, Judge, that would be inappropriate, but those are not these facts. Well ñ I mean, I don't ñ I think it's a little ñ to me it gets a little tenuous when you're arguing that it's okay for lawyers to use pressure to prevent witnesses from testifying truthfully. I mean, it may well be that pressure alone constitutes some sort of witness tampering. I'm just saying that as I stand here today ñ I didn't say witness tampering. I said appropriate. Whether it's ñ Probably it may or may not rise to witness tampering as a criminal offense. All right. Okay, so now I think I understand the question. Well, I don't know if I did, but I hope I did. Well, a sanction worthy ñ and I'm not trying to talk about witness tampering. What's sanction worthy is the issue. And a judge ought to judge to sanction one lawyer for pressuring or using personal contacts or whatever to keep somebody from testifying. It sounds ñ I mean, I wasn't a district judge. I haven't dealt with all of these questions, but it sounds sleazy. Judge Maloney looked at this issue by saying that the amount of alleged ñ Mr. Hayward here, who was the object, his affidavit was the object, but he was not the recipient of the letter. He did not receive the letter. It's the city attorney that received it. Why did we send the letter to the city attorney? Very simply, we had site plan approvals. We had other land use approvals. We had rulings and decisions that had been made by Lansing Township, which Mr. Hayward was directly contradicting. And we were very concerned that all of a sudden what we believed to be etched in stone in terms of our rights was no longer there. Mr. Hayward was now saying we didn't have proper approvals. We then sent a second letter to Mr. Gressens, the city attorney, a few days after the first letter, outlining in detail all of ñ and that's part of the record as well ñ outlining all of those very specific concerns that we had. Judge Maloney properly ruled that the measure of whether this constitutes a sanctionable event is not measured by the reaction of the person who may be the object of it. Mr. Hayward alleges that he was intimidated by this. But the record also reflects that he, in fact, prepared and supplied a second affidavit for the benefit of appellants in this case. And for him to allege, and for these parties to allege, that Mr. Hayward was intimidated to the point where he would no longer cooperate simply isn't borne out by the facts. If someone's intimidated, it doesn't seem to me to be the unnecessary requirement for whether something is sanctionable. You could have a sanctionable letter that didn't work, couldn't you? Well, you could have a sanctionable letter that didn't work if you were making a direct threat. So if we put aside whether it actually worked, although it does look like he didn't testify, but if you put aside whether it didn't work, you could look at this letter one way, but you could also look at it. It kind of has the feel of don't let this guy testify. Look what this person's doing. It's not in your interest. We do a lot of business with you. Well, we look to the intent of the party. And there's an affidavit in this case from the author of the letter. There's a second letter to the township attorney from the author of the first letter. And those things bear out the conclusion that Judge Maloney reached, which there was no intent here to harass or intimidate this witness. He obviously wasn't harassed or intimidated. He continued to participate. This was an attempt, we think, by the appellants in this case to simply try to give Walmart a black eye during the course of this litigation. And this ruling by Judge Maloney is going to be reviewed on an abuse of discretion standard. And I think that Judge Maloney had ample basis to reach the conclusions that he reached. Can you tell me quickly where the letter is? Maybe Judge Rogers has it. I think I have it. Is this the one that has Dave Dodd, Dodd a man, up at the top? Well, this is, it looks like, is the city attorney Mr. Grayson? Grayson, yes, right. Judge Maloney felt that this motion for sanctions was itself so frivolous, and I'll quote, Eastwood's characterization of the October 29, 2014 letter is disingenuous at best and deceitful at worst. He found that this filing of the motion for sanctions against Walmart was, in fact, itself a possible basis for a claim for sanctions against Eastwood. Well, you know, I don't know. I mean, if you viewed in a different light, you could say, I mean, you could see what the motivation here was. And I would say that the motivation was really more to warn the township that Mr. Haygood, Hayward, could very easily be putting the township in a precarious legal position. It was putting our rights, Walmart's rights, in a precarious legal position. That was, I think, the greater concern. And we wanted to make sure that the township wasn't going to reverse field outside of the procedures. Well, that obviously was in your interest. Yeah. I mean, that's the motivation here. You know, we get an affidavit that's been prepared for litigation. One way you might protect your own interest is to suggest to the township that perhaps its representative was getting it in a little bit of a pickle with regard to consistency in its statements and with regard to its role in this contractual dispute. Is that right? Yes. You're shaking your head. Yes. Okay. Well, if nobody has any other questions, your time is up. Is there anything else? No. All right, Mr. Tomlin. Thank you. Touching briefly on some of the points raised by the court and by Mr. Mucha, again, there's only two sizes set forth anywhere in this first lease amendment for this construction. The pre-expansion size and the post-expansion size. Nowhere in that document does it say up to 213.234, not to exceed 213.234. It says 213.234. Walmart would have this court read into that exhibit the fact that that means something other than what it says, that it means maybe less than 213.234. What's 213.234? Is that one number? Yes, that's the expansion size, 213,234 square feet. I was struck by two quotes that Mr. Mucha used during his discussion. He said, we need to look to the purpose of the exhibits. That's exactly what we've been saying throughout this entire case, is that when you look at all the exhibits in this case, we feel they supported Eastwood. The problem was there was such an avalanche of documents dumped on the district court early on with no oral argument in this case to explain it. Well, Judge Maloney is pretty seasoned, and I imagine he is perfectly capable of digesting whatever documents you all dumped on him. I would agree, Your Honor, except there's one thing I would highlight in that. If we take a look, the court in three different locations indicated that there was no agreement between the parties as to any possible square footages. But in fact, the court addressed the fact that Exhibits C and D existed, but the court simply dismissed them, never included it in its analysis as part of the agreement. Under the Omnicom case, because the First Amendment post-dated Paragraph 14J, which is the paragraph that Walmart bases its whole theory on, Paragraph 14J says they don't need to build, and if they do build, they can go dark. It doesn't say that it excuses them from otherwise complying with the requirements of the building restrictions, of the footprints, of the sizes of the building. It never says that. So when we take a look at the Omnicom case and we look at 14J, 14J either has to be consistent with, inconsistent with, or ambiguous with the First Amendment. If it's ambiguous with the First Amendment, the court should have ordered that there be a hearing. If it was inconsistent with the First Amendment, then Omnicom says that the First Amendment should have overruled 14J. And if it was consistent with 14J, then the court was obligated under the Clapp case to read all the documents harmoniously and to give effect to every word and phrase. The one thing which we absolutely know the court did not do in this case is give any effect to Exhibit C and D and to the expansion language of 213,234 square feet. If the court reads every word and gives it its purpose and it leads to an absurdity, then the court has to construe that in a way that really makes sense with the contract. And here, it seems like looking at all of these things, there's nothing that leads us to the conclusion that this 213,234 was a mandate to Walt Marth. They had to build to that. I think, Your Honor, that that was the second point that Mr. Mucha, that I was going to talk about. I said Mr. Mucha said two things that struck me. And what he said was, well, why were they there at all? What was the point of putting in the 213,234 square feet if it didn't mean something? Stealing, perhaps? Again, perhaps. And that's why this matter should have proceeded to a trial. Testimony should have been taken from Mr. Ide, who is the principal of Eastwood, from principals at Wal-Mart, and then we should have had a trial over what this First Amendment meant in light of the original lease documents. But the court short-circuited all that and completely deprived. Your time is up. Oh, thank you. I don't think you're adding anything to your answer to Judge Donald at this point. Well, I was just going to ask the court, in response to that question, to take notice of the Jewett, Bigelow, and Brooks v. Detroit Edison case, which we cite in our brief, which basically says it's not the place of the court to substitute. We can look and read the case. Thank you, Your Honor. Did you have anything further? We thank you both for your argument. We'll consider the case carefully. Thank you for your time today, Your Honors. Thank you very much. Have a pleasant day.